UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FAMILIES FOR FREEDOM, JANE DOE          :
MARY DOE, and JOHN DOE,                 :
                                        :
                    Plaintiffs,         :
                                        :
          - against -                   :       OPINION AND ORDER
                                        :
U.S. CUSTOMS AND BORDER                 :       10 Civ. 2705 (SAS)
PROTECTION, U.S. IMMIGRATION AND        :
CUSTOMS ENFORCEMENT, and U.S.           :
DEPARTMENT OF HOMELAND                  :
SECURITY,                               :
                                        :
                    Defendants.         :
-------------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.      INTRODUCTION

        Families for Freedom, a non-profit advocacy organization, along with

Jane Doe, Mary Doe, and John Doe, three individuals in deportation proceedings

(collectively, "Plaintiffs"), bring suit against U.S. Customs and Border Protection

("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and the U.S.

Department of Homeland Security ("DHS") (collectively, "Defendants"), seeking

release of certain government records pursuant to the Freedom of Information Act

("FOIA").[1] The requested records pertain primarily to the scope and practices of

_____

[1]     5 U.S.C. § 552 *et seq.*

1

CBP operations on inter-city buses and trains within the geographic area designated as the "Buffalo Sector."[2]  Defendants now move for partial summary judgment on their invocation of FOIA exemptions to withhold, in whole or in part, certain responsive documents.[3]  Plaintiffs oppose defendants' motion and request that the Court order production of four groups of documents that they allege were improperly redacted or withheld entirely.[4]  For the reasons stated below, defendants' motion for summary judgment is granted in part and denied in part, and defendants are ordered to produce a number of the withheld documents.

## II.   BACKGROUND

On February 26, 2009, plaintiffs submitted an initial FOIA request to CBP.[5]  On April 2, 2010, plaintiffs submitted a second FOIA request to CBP, and submitted similar FOIA requests to ICE and DHS.[6]  Through their requests, plaintiffs sought information primarily concerning the activities of the Buffalo

---

[2]        *See* First Amended Complaint ("Compl.") [Docket No. 9] ¶ 2.

[3]        *See* Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Exemptions ("Def. Mem.") at 1, 25.

[4]        *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment on Exemptions ("Opp. Mem.") at 2.

[5]        *See* Def. Mem. at 1.

[6]        *See id.*

Sector of the United States Border Patrol, a subdivision of CBP, as well as the related activities of ICE.[7]  Buffalo Sector is one of twenty Border Patrol sectors and covers 450 miles of border between the United States and Canada.[8]  The Buffalo Sector's responsibilities encompass Pennsylvania, Maryland, Virginia, West Virginia and most of New York State.[9]

Plaintiffs assert that "Border Patrol officers improperly engage in interior enforcement of immigration laws by questioning bus and train travelers about their immigration status on inter-city conveyances that never cross the border."[10]  Alleging that these activities exceed the Border Patrol's "statutory and regulatory authority and violate the Fourth Amendment," plaintiffs state that the requested records are necessary to inform the public about the activities of its government and are relevant to various pending deportation proceedings, including those of Jane Doe, Mary Doe, and John Doe.[11]

### A.   February 26, 2009 FOIA Request to CBP

---

[7]      *See id.;* Compl. ¶ 17.  DHS is the umbrella agency under which both ICE and CBP are subsumed.

[8]      *See* Def. Mem. at 1.

[9]      *See id.* (citing 10/22/10 Declaration of Edward X. Castillo, Border Patrol Agent).

[10]     Compl. ¶ 2.

[11]     *Id.* ¶ 4.

The February 26, 2009 FOIA request to CBP sought: (1) I-213 arrest forms for persons apprehended on Amtrak trains by Border Patrol agents from the Rochester Border Patrol Station for the years 2003-2008; (2) arrest statistics relating to those apprehensions, broken down by the length of time the immigrant was in the United States; (3) total arrest statistics for the Rochester Station for the years 2003-2008; (4) explanations and listings of the various codes that are used on the Form I-213s; (5) arrest quotas, goals, targets or expectations for Border Patrol agents from the Buffalo Sector and the Rochester Station for the years 2003-2008; (6) performance review standards for Border Patrol agents from the Buffalo Sector and the Rochester Station for the years 2003-2008; (7) training materials on racial profiling; (8) training materials on Amtrak enforcement operations; (9) reports concerning Amtrak arrests for the years 2003-2008; (10) agreements between CBP and Amtrak; and (11) standards of conduct for CBP officers at the border and in the interior.[12]

In response to this initial FOIA request, CBP indicated that it had identified eighty-one pages of responsive documents, fifty of which were withheld in their entirety pursuant to Exemptions 2 – including "Low 2" and "High 2"[13] – 5,

[12]    *See id.* ¶ 29.

[13]    The terms "Low 2" and "High 2" were used for many years to describe two different categories of information withheld pursuant to 5 U.S.C. §

6, 7(C), and 7(E).[14]  Fifteen pages were released with redactions made pursuant to

Exemptions "Low 2," "High 2," 6, 7(C), and 7(E).[15]  The Department of Justice

("DOJ") and DHS also produced several documents that had been identified by

CBP and referred to those agencies as the original authors for review and release.[16]

On August 17, 2009, plaintiffs appealed by letter the agency's

response, challenging the adequacy of the search and the propriety of the claimed

exemptions.[17]  From September through November 2009, plaintiffs communicated

on several occasions with CBP about their appeal, but the agency produced no

further documents.[18]  Deeming their administrative remedies exhausted, plaintiffs

filed suit against CBP on March 26, 2010, alleging that the agency had violated

---

552(b)(2), under the reasoning of *Crooker v. Bureau of Alcohol, Tobacco, and Firearms*, 670 F.2d 1051 (D.C. Cir. 1981).  The Supreme Court recently overruled *Crooker* in its decision in *Milner v. Department of the Navy*, 131 S.Ct. 1259 (2011).  The *Milner* decision was issued after the parties completed briefing the instant motion, but both parties have submitted supplemental letters addressing *Milner*.  A fuller discussion of *Milner* and its application to this case follows below.

[14]     *See* Compl. ¶ 40.

[15]     *See id.*

[16]     *See id.* ¶ 42.

[17]     *See id.* ¶ 41.

[18]     *See id.* ¶¶ 43-51.

FOIA by failing to release records, and seeking declaratory and injunctive relief.[19]

**B.     April 2, 2010 FOIA Requests to CBP, ICE, and DHS**

On April 2, 2010, plaintiffs served a second FOIA request on CBP and initial FOIA requests on ICE and DHS.[20]  The second request to CBP sought information similar to that sought in the first request, but added several categories of information and updated the request to include 2009 data.[21]  The request to ICE

---

[19]     *See* Def. Mem. at 3; Original Complaint [Docket No. 1].

[20]     *See* Def. Mem. at 3.

[21]     *See* Compl. ¶ 53.  The April 2, 2010 request to CBP sought the following information: "(1) I-213 arrest forms for persons apprehended on inter-city trains and buses by officers out of the Rochester Border Patrol Station from 2003 to 2009; (2) arrest statistics for the Buffalo Sector and the Rochester Station from 2003 to 2009 for persons apprehended on inter-city trains and buses for whom I-213s were issued, broken down by the length of time the immigrant was in the United States, country of citizenship, complexion, and criminal record; (3) total arrest statistics for the Buffalo Sector and the Rochester Station from 2003 to 2009 for people for whom I-213s were issued, broken down by length of time the immigrant was in the United States, country of citizenship, complexion, and criminal record; (4) total arrest statistics for the Buffalo Sector and the Rochester Station from 2003 to 2009; (5) staffing levels for the Buffalo Sector and the Rochester Station from 2003 to 2009; (6) explanations and listings of certain codes on the arrest forms; (7) arrest quotas, targets or goals for Border Patrol officers operating in the Buffalo Sector and at the Rochester Station for 2003 to 2009; (8) performance review standards for Border Patrol officers operating in the Buffalo Sector and at the Rochester Station for 2003 to 2009; (9) training materials on racial profiling; (10) training materials on inter-city train and bus enforcement operations; (11) reports concerning arrests on inter-city trains and buses from 2003 to 2009; (12) agreements, understandings, or communications between CBP or Border Patrol and inter-city train or bus operators regarding transportation checks; (13) agreements, understandings, or communications between CBP, Border Patrol,

sought information similar to that in the CBP request of the same date, but also requested records concerning performance standards, arrest quotas, targets, or goals for ICE officers.[22]  The April 2, 2010 request to DHS sought: (1) agreements, understandings, or communications between CBP, Border Patrol, DHS and/or ICE regarding transportation checks; (2) performance standards or arrest quotas, targets or goals for Border Patrol officers in effect during the previous six years, preferably broken down by Sector and Station; (3) performance standards, arrest quotas, targets, or goals for ICE officers, including those that can be satisfied by Border Patrol arrestees that are transferred to ICE custody; and (4) reports containing information about arrests on inter-city trains and buses during the previous six years.[23]

The agencies acknowledged receipt of plaintiffs' April 2, 2010 FOIA requests, but did not produce any responsive documents.[24]  Plaintiffs amended their Complaint on May 21, 2010, adding ICE and DHS as defendants, and again claiming that the failure to release records and the failure to make a determination

---

DHS, and/or ICE regarding transportation checks; and (14) standards of conduct for CBP officers at the border and in the interior." *Id.*

[22]     *See id.* ¶ 57.

[23]     *See id.* ¶ 60.

[24]     *See id.* ¶¶ 56, 59, 62.

regarding plaintiffs' requests for expedited processing violated FOIA.[25]

### C.   Productions in Response to Litigation

In response to the instant suit, and pursuant to an agreement negotiated with plaintiffs, CBP performed additional searches and produced additional documents.[26]  In total, CBP produced sixty pages of responsive documents in their entirety and six hundred and twenty-four pages with redactions, while withholding seven hundred and eight pages in their entirety based on certain exemptions.[27]  In response to the instant suit, ICE identified one hundred and twenty-six  pages of responsive documents, producing eighty-three  pages in their entirety and forty-three pages with redactions based on certain exemptions.[28]  ICE did not withhold any documents in their entirety.[29]

Defendants now move for summary judgment as to whether defendants have properly withheld records, in whole or in part, based on the

---

[25]   *See* Def. Mem. at 3; Compl. ¶¶ 79-82.

[26]   *See* Def. Mem. at 3.

[27]   *See id.* at 6.

[28]   *See id.* at 7.

[29]   *See id.*

asserted exemptions.[30]  Plaintiffs, in opposing defendants' motion, ask the Court to order the production of four sets of documents, which they allege defendants have improperly redacted or withheld in their entirety.  Those documents are described by plaintiffs as follows: *first*, the Buffalo Sector Daily Reports and related commentary, identified by CBP in US000811-US000816 and US000867-US001518; *second*, sample Form I-213s, identified by CBP as US00119-US000735; *third*, training memoranda on agency policies regarding racial profiling and conduct of agents during transportation checks, identified by CBP as US000817-US000866; and *fourth*, the authors and recipients of a memorandum identified by ICE as US000112 and an email identified by ICE as US000114.[31]

## III.   APPLICABLE LAW

### A.   FOIA and Summary Judgment

FOIA cases are generally and most appropriately resolved on motions for summary judgment.[32]  Summary judgment in the FOIA context, as in any other, is appropriate if the record "show[s] that there is no genuine issue as to any

---

[30]   On the Court's instructions, the adequacy of the search was not briefed.  That issue will be addressed separately at a later date, if necessary.

[31]   *See* Opp. Mem. at 2.

[32]   *See Bloomberg L.P. v. Board of Governors of the Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009); *Miscavige v. Internal Revenue Serv.*, 2 F.3d 366, 369 (11th Cir. 1993).

material fact and that the moving party is entitled to judgment as a matter of law."[33]

"An issue of fact is genuine if 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'  A fact is material if it 'might affect the

outcome of the suit  under the governing law.'"[34]  "In ruling on a motion for

summary judgment, a court must resolve all ambiguities and draw all factual

inferences in favor of the nonmoving party."[35]

However, unique to the FOIA context, "[a]ffidavits submitted by an

agency are accorded a presumption of good faith," and so long as such affidavits

"supply[] facts indicating that the agency has conducted a thorough search and

giv[e] reasonably detailed explanations why any withheld documents fall within an

exemption," they will sustain the agency's burden and summary judgment may be

awarded without discovery being conducted.[36]  Nonetheless, "[t]he agency's

decision that the information is exempt from disclosure receives no deference."[37]

---

[33]     Fed. R. Civ. P. 56(c).

[34]     *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[35]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing
*Anderson*, 477 U.S. at 242, 255).

[36]     *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.
1994) (quotation marks and citations omitted).

[37]     *Bloomberg, L.P. v. Board of Governors of the Fed. Reserve Sys.*, 601
F.3d 143, 147 (2d Cir. 2010).

Accordingly, a court is required to conduct a *de novo* review of the record,

deciding "'whether the agency has sustained its burden of demonstrating that the

documents requested are not agency records or are exempt from disclosure under

the FOIA.'"[38]

      In addition to affidavits, agencies generally submit *Vaughn* indexes to

sustain their burden.  A *Vaughn* index is an itemized listing of the non-disclosed

records, describing each record and portion withheld, and providing a detailed

justification for the agency's withholding, specifying the FOIA exemption that it

has applied.[39]  The purpose of a *Vaughn* index is to "(a) [] permit [the opposing

party] to contest the affidavit in [an] adversarial fashion," and to "(b) [] permit a

reviewing court to engage in effective *de novo* review of the [government's]

redactions."[40]

      At the heart of FOIA is "a policy strongly favoring public disclosure

---

[38]    *In Def. of Animals v. National Inst. of Health*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008) (quoting *Assassination Archives and Research Ctr. v. Central Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003)).  *See also* 5 U.S.C. § 552(a)(4)(B); *Carney*, 19 F.3d at 812 ("In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA.").

[39]    *See Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973).

[40]    *Halpern v. Federal Bureau of Investigation*, 181 F.3d 279, 293 (2d Cir. 1999).

of information in the possession of federal agencies."[41]  However, FOIA provides

nine categories of information that are exempt from disclosure.[42]  Four of those

exemptions are relevant to the instant matter – Exemptions 2, 5,6, and 7.  Under

Exemption 7, defendants cite both subsection (C) and subsection (E), which I

address separately below.

### 1.     FOIA Exemptions 2 and 7(E)

Exemption 7(E) protects "records or information compiled for law

enforcement purposes," that, if disclosed, "would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would disclose

guidelines for law enforcement investigations or prosecutions if such disclosure

could reasonably be expected to risk circumvention of the law."[43]  Exemption 2

protects from disclosure information that is "related solely to the internal personnel

rules and practices of an agency."[44]  For many years, following the D.C. Circuit's

ruling in *Crooker v. Bureau of Alcohol, Tobacco, and Firearms*,[45] courts held that

Exemption 2 protected two categories of information: (1) materials concerning

---

[41]     *Id.* at 286.

[42]     *See id.* at 287.

[43]     5 U.S.C. § 552(b)(7)(E).

[44]     *Id.* § 552(b)(2).

[45]     670 F.2d 1051.

human resources and employee relations (known as "Low 2"),[46] and (2) "predominantly internal" information that, if disclosed, would "significantly risk[] circumvention of agency regulations or statutes"[47] (known as "High 2").

In its recent decision in *Milner v. Department of the Navy*, the Supreme Court explicitly overruled *Crooker* and its progeny.  In *Milner*, the Court, after considering the statutory language and the legislative history of FOIA, held that "Exemption 2, consistent with the plain meaning of the term 'personnel rules and practices,' encompasses only records relating to issues of employee relations and human resources."[48]  As a result, after *Milner*, High 2 has ceased to exist; and "Low 2 is all of 2."[49]  In its reasoning, the Court gave significant weight to Congress's amendment of Exemption 7(E) in 1986, noting that "the *Crooker* construction of Exemption 2 renders Exemption (b)(7)(E) superfluous and so deprives that amendment of any effect."[50]  The Court added, "[w]e cannot think of any document eligible for withholding under Exemption 7(E) that the High 2

---

[46]     *Milner,* 131 S.Ct. at 1262-63 (discussing the development of the *Crooker* doctrine).

[47]     *Crooker,* 670 F.2d at 1074.

[48]     *Milner,* 131 S.Ct. at 1271.

[49]     *Id.* at 1265.

[50]     *Id.* at 1268.

reading does not capture."[51]  In fact, prior to *Milner*, agencies frequently cited Exemption 2 in conjunction with Exemption 7(E), due to the conceptual overlap between the two under the *Crooker* doctrine.

## 2.    FOIA Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party other than an agency in litigation with the agency."[52]  The exemption incorporates "all normal civil discovery privileges,"[53] including the attorney-client privilege and the attorney work-product doctrine.[54]  "The test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance."[55] "Whether its immunity from discovery is absolute or qualified, a [privileged] document cannot be said to be subject to 'routine' disclosure," and thus, is

---

[51]     *Id.*

[52]     5 U.S.C. § 552(b)(5).

[53]     *Hopkins v. United States Dep't of Housing and Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

[54]     *See National Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149-55 (1975); *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999).

[55]     *Federal Trade Commission v. Grolier, Inc.*, 462 U.S. 19, 26 (1983) (quoting *Sears, Roebuck*, 421 U.S. at 148-49).

14

protected under Exemption 5.[56]

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services."[57]  Advice from an attorney to his or her client is also protected by the privilege.[58]  "In the governmental context, the client may be the agency and the attorney may be an agency lawyer."[59]  The attorney-client privilege under Exemption 5 "is narrowly construed and is limited to those situations in which its purpose will be served."[60]  "The agency bears the burden of showing that the information exchanged was confidential.  That is, the agency must show that it supplied information to its lawyers 'with the expectation of secrecy and was not known by or disclosed to any third party.'"[61]

---

[56]     *Id.* at 27.

[57]     *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997) ("*Tax Analysts I*").

[58]     *See In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992).

[59]     *Tax Analysts I*, 117 F.3d at 618.

[60]     *Coastal States Gas Corp.* v. Department of Energy, 617 F.2d 854, 862 (D.C. Cir. 1980).

[61]     *Judicial Watch, Inc. v. United States Postal Serv.*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004) (quoting *Mead Data Cent., Inc. v. Department of the Air Force*, 566 F.2d 242, 254 (D.C. Cir. 1977)).

The attorney work product doctrine applies "to memoranda prepared by an attorney in contemplation of litigation which sets forth the attorney's theory of the case and [her] litigation strategy."[62] "The attorney work product privilege protects 'the files and the mental impressions of an attorney . . . reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways' prepared in anticipation of litigation."[63]

The doctrine is "limited in scope and does not protect every written document generated by an attorney."[64] "[A]n attorney's mental impressions do not become protected work product simply because they were expressed *concurrently with* some form of litigation."[65] Additionally, "'[d]ocuments that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation' are not protected as attorney work

---

[62]   *Sears, Roebuck*, 421 U.S. at 154.

[63]   *A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 146 (2d Cir. 1994) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11(1947)).

[64]   *New York Times Co. v. United States Dep't of Def.*, 499 F. Supp. 2d 501, 517 (S.D.N.Y. 2007).

[65]   *FPL Grp., Inc. v. Internal Revenue Serv.*, 698 F. Supp. 2d 66, 85-86 (D.D.C. 2010).

product."[66]

### 3.    FOIA Exemptions 6 and 7(C)

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[67]  The purpose of Exemption 6 is to "'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'"[68]  The Supreme Court has interpreted Exemption 6 broadly to encompass any "information which applies to a particular individual."[69]  If disclosure would compromise "substantial privacy interests," it need not be disclosed.[70]  If no substantial privacy interest is established, however, the court must weigh the "potential harm to privacy interests" against "the public interest in disclosure of the requested information."[71]  The "only relevant public interest to be

---

[66]    *New York Times Co.*, 499 F. Supp. 2d at 517 (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)).

[67]    5 U.S.C. § 552(b)(6).

[68]    *Wood v. Federal Bureau of Investigation,* 432 F.3d 78, 86 (2d Cir. 2005) (quoting *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982)).

[69]    *Washington Post Co.*, 456 U.S. at 602.

[70]    *Aguirre v. Securities and Exch. Comm'n*, 551 F. Supp. 2d 33, 53 (D.D.C. 2008).

[71]    *Id*.

weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government."[72]  "The requesting party bears the burden of establishing that disclosure of personal information would serve a public interest cognizable under FOIA."[73]  However, information that "merely identifies the names of government officials who authored documents and received documents" does not generally fall within Exemption 6.[74]

Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."[75]  Exemption 7(C) requires balancing of privacy interests and the public interest as well.[76]  However, the privacy interests of Exemption 7(C) have been construed more broadly than those of Exemption 6.  "First, whereas Exemption 6 requires that the

---

[72]   *United States Dep't of Def. v. Federal Labor Relations Auth.*, 510 U.S. 487, 495 (1994).

[73]   *Associated Press v. United States Dep't of Justice*, 549 F.3d 62, 66 (2d Cir. 2008) (citing *National Archives and Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).

[74]   *Aguirre*, 551 F. Supp. 2d at 53.

[75]   5 U.S.C. § 552(b)(7)(C).

[76]   *See McCutchen v. United States Dep't of Health and Human Servs.*, 30 F.3d 183, 185 (D.C. Cir. 1994).

invasion of privacy be 'clearly unwarranted,' the adverb 'clearly' is omitted from Exemption 7(C) . . . Second, whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion."[77]

## IV.   DISCUSSION

Plaintiffs contest defendants' withholding of documents that fall into four categories, but do not contest numerous other exemptions invoked by defendants.  Thus, I grant defendants' motion for summary judgment as to the following categories of documents, which plaintiffs do not dispute:

(1)   redactions of certain ICE internal codes and databases;[78]

(2)   phone numbers for the National Law Enforcement Communications Center and the Buffalo Sector duty agent;[79]

(3)   documents that contain descriptions of a law enforcement technique

---

[77]   *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989) (quoting 5 U.S.C. §§ 552(b)(6), (b)(7)(C)).

[78]   US000082, US000100, US000113, US000790.  *See* Def. Mem. at 10-11; Table of Defendants' Redactions and Withholdings ("Table"), Ex. C to Opp. Mem., at 1-3; Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Exemptions ("Reply Mem.") at 1.

[79]   US000805.  *See* Def. Mem. at 11; Table at 3; Reply Mem. at 1-2.

known as a "cold convoy;"[80]

(4)     names of ICE course instructors;[81]

(5)     name and phone number of the deputy assistant director of the
        Compliance Enforcement Division;[82]

(6)     name and phone number of the National Fugitives Operations Plan
        acting unit chief;[83]

(7)     phone numbers of Border Patrol agents;[84]

(8)     names and other personal identifying information of aliens whose
        information appears in ICE classroom training materials;[85]

(9)     other sample training materials from Glynco County Jail;[86]

---

[80]     US000805, US000810.  *See* Def. Mem. at 12; Table at 3; Reply Mem.
at 2.

[81]     US000073.  *See* Def. Mem. at 22; Table at 1; Reply Mem. at 2.

[82]     US000099.  *See* Def. Mem. at 23; Table at 1; Reply Mem. at 2.

[83]     US000107.  *See* Def. Mem. at 23; Table at 2; Reply Mem. at 2.

[84]     US000807-808.  *See* Def. Mem. at 23; Table at 4; Reply Mem. at 2.

[85]     US000745-749, 754,759,764, 770, 774.  *See* Def. Mem. at 23; Table
at 3; Reply Mem. at 2.

[86]     US000755-758, 760-763, 765-769, 771-773, 775-776.  *See* Def. Mem.
at 23; Table at 3; Reply Mem. at 2.

(10)   those redactions on the sample I-213s that have not been challenged.[87]

I now turn to the categories of documents for which plaintiffs contest defendants' asserted exemptions.

### A.   Buffalo Sector Daily Reports

Defendants withheld in their entirety the six Buffalo Sector Daily Reports that contain annual apprehension statistics for 2004 through 2009 for the six Border Patrol stations within Buffalo Sector,[88] and the comments pages from five hundred and eighty-four Buffalo Sector Daily Reports that provide detailed information on arrests made by Border Patrol agents.[89]  Plaintiffs argue that those documents are responsive to their demands and that defendants have improperly applied FOIA exemptions to withhold the documents.

Specifically, plaintiffs sought information about the percentage of Rochester Station and Buffalo Sector arrests that were attributable to CBP's transportation raids.[90]  CBP has disclosed the total number of transportation raid arrests made by the Rochester Station for the years 2006-2009, and the total

---

[87]   US000119-735.  *See* Table at 3; Reply Mem. at 1 n.2.

[88]   US000811-816.  *See* Opp. Mem. at 6.

[89]   US000867-001518.  *See* Opp. Mem. at 6.; Def. Mem. at 12.

[90]   *See* Opp. Mem. at 5.

number of all arrests made by the Buffalo Sector for the years 2003-2009.

However, the agency has withheld documents that would reveal the total number

of *all arrests* made by the Rochester Station for each year, and the total number of

*transportation raid arrests* by the Buffalo Sector.[91]  This partial withholding has

prevented plaintiffs from calculating the percentage of arrests attributable to

transportation raids, as was their aim in requesting this information.  The missing

data is contained in the six Buffalo Sector Daily Reports that have been withheld in

their entirety.[92]

   Plaintiffs also sought "[a]ny documents that contain any information

regarding arrest quotas, targets, goals and expectations."[93]  Defendants identified

US000867-001518 as the comments pages of five hundred and forty-eight separate

Buffalo Sector Daily Reports, which include "details of apprehensions," and which

have been withheld.[94]  On the theory that such commentary "will likely convey the

agency's own reflections on what kinds of arrests are appropriate and expected of

officers," plaintiffs suggest that those portions of the Buffalo Sector Daily Reports

---

[91]  *See id.*

[92]  *See id.*

[93]  *Id.* at 6 n.3 (quoting Compl., Tab A, #9; Tab O, #13; Tab P, #11; Tab R, #2, 3).

[94]  *Id.* at 6.

would be responsive to their demand.[95]

To justify their withholding of the specified pages from the Buffalo Sector Daily Reports, defendants have cited to Exemptions High 2 and 7(E).[96] The briefing in this case was completed just prior to the decision in *Milner*; as a result, the parties' briefs include detailed arguments about the applicability of the now non-existent High 2 Exemption. However, as the parties suggested in their post-*Milner* letters to the Court, my analysis is little altered, as defendants claimed Exemptions 7(E) and High 2 concurrently as to those documents.[97] In view of *Milner*, I address only the applicability of Exemption 7(E) to the contested documents.

Defendants have withheld the Buffalo Sector Daily Reports under Exemption 7(E) on the grounds that (1) release of the contested documents risks enabling circumvention of the law;[98] (2) courts have routinely upheld the invocation of the exemption when matters of national security are at issue, which

---

[95]     *Id.*

[96]     *See id.* at 12.

[97]     *See* 3/9/11 Letter from Plaintiffs to the Court ("Pl. Letter"); 3/18/11 Letter from Defendants to the Court ("Def. Letter").

[98]     *See* Def. Mem. at 12-14.

includes securing of the borders;[99] and (3) the fact that the agency has chosen to disclose a certain subset of apprehension statistics does not signify that it has waived its right to assert an exemption as to other such statistics.[100]  For the reasons explained below, I find that defendants are entitled to withhold some of the documents, or portions of some of the documents, sought by plaintiffs.

*First*, I find that defendants must release the portions of the six Buffalo Sector Daily Reports that indicate the total number of all arrests made by the Rochester Station for each year, and the total number of transportation raid arrests within the Buffalo Sector.  Such statistics are neither "techniques or procedures" nor "guidelines," such that they could be properly exempt under 7(E).[101]  As a result, I need not reach whether disclosure of such information risks circumvention of the law.

However, were I to reach the latter issue, I would find that release of this information does not pose that risk.  Plaintiffs are not requesting arrest

_____

[99]     *See id.* at 14-15.

[100]     *See id.* at 16-18.

[101]     *See Allard K. Lowenstein Int'l Human Rights Project v. Department of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) (relying on Webster's Dictionary to define "guidelines" as "an indication or outline of future policy or conduct," "techniques" as "a technical method of accomplishing a desired aim" and "procedures" as "a particular way of doing or going about the accomplishment of something").

statistics for *each station* within the Buffalo sector, which could theoretically aid circumvention of the law by publicizing the relative activity or success of Border Patrol agents in effecting apprehensions at each station, as defendants fear.[102] Rather, plaintiffs seek information only about the Buffalo Sector as a whole and Rochester Station in particular.  This information will aid plaintiffs in calculating the percentages that they argue are important to enable the public to understand the role and significance of transportation-based arrests, but it will not reveal the comparative strengths and weaknesses of the various stations within the Buffalo Sector.  To the extent that the Daily Reports include arrest data broken down by station, defendants may redact the information so that only the Rochester Station arrest data and Buffalo Sector arrest totals are disclosed.

I note also that CBP is not required to create a spreadsheet with this information, even if it has done so for similar information in the past.[103]  Rather, it must simply disclose the documents that contain this information.  On the other hand, if the agency finds it simpler to compile such information into a spreadsheet rather than to conduct extensive redactions, it may produce such a spreadsheet to plaintiffs in lieu of the heavily redacted Reports.

---

[102]     *See* Def. Mem. at 14, 17.

[103]     *See id.* at 17.

*Second*, I find that defendants must re-evaluate the comments sections of the five hundred and forty-eight Buffalo Sector Daily Reports and produce those portions that are responsive and not exempt.  Defendants argue that the Reports contain "a trove of information on Border Patrol's law enforcement efforts throughout Buffalo Sector," and proceed to list a half dozen types of information that, if disclosed, would risk circumvention of the law.[104]  As a result, they have withheld the comments pages of the Reports in their entirety.  However, they should have – and are now ordered to – analyze whether the pages in question contain non-exempt information that is segregable from exempt information.

For example, plaintiffs have already conceded that certain information is or may be properly exempt, such as names and identifying information of arrestees, and "commentary related to surveillance, the use of informants, or the

---

[104]  "Names and other identifying personal information of the individuals arrested; the locations of their arrests, including the train routes, train stations, bus routes and stations, and other locations around which Border Patrol agents focus their law enforcement efforts; the names of databases that Border Patrol agents query to run immigration and criminal history checks on individuals they detain; the stations in which Border Patrol agents focus their transportation check efforts; the specific times of day in which Border Patrol agents conduct transportation checks at certain locations; details on coordination efforts between Border Patrol agents and other federal and state law enforcement agencies; Border Patrol sources of information; Border Patrol methods for locating contraband; and other sensitive law enforcement methods and techniques."  *Id.* at 12-13 (citing Declaration of Robert Lewandowski, U.S. Border Patrol Chief of Staff ("Lewandowski Decl."), submitted with Defendants' Motion for Summary Judgment, ¶ 27).

identities of arrested individuals and arresting officers."[105]  There may be

additional information that is properly exempt, such as Border Patrol methods for

locating contraband, which clearly constitute "techniques and procedures."[106]  On

the other hand, certain information has already been disclosed in response to this

FOIA request, thereby waiving defendants' right to claim exemptions for that

information – in particular, the names of certain databases in which Border Patrol

agents run queries.[107]

      Plaintiffs have made clear the type of information that they seek –

"performance expectations for arrest rates, agency communications with

transportation operators, and inter-agency communications regarding

transportation raids."[108]  While the sorts of information that defendants describe as

constituting "sensitive law enforcement methods and techniques"[109] may appear in

---

[105]    Opp. Mem. at 10.

[106]    Plaintiffs concede this possibility, stating "[i]f CBP has a particular non-public technique or method that it wishes to redact, it should so note[.]"  *Id.* at 10.  *See also id.* at 11-12.

[107]    *See id.* at 10.  *Cf. Coastal Delivery Corp. v. United States Customs Serv.*, 272 F. Supp. 2d 958, 965-66 (C.D. Cal. 2003) (finding that waiver of right to argue exemptions exists only if agency "disclosed *the exact information* at issue" and that there was no waiver since "merely the *same category of information, not the exact information*" had been previously disclosed) (emphasis added).

[108]    Opp. Mem. at 6.

[109]    Def. Mem. at 13.

the communications between the agencies, and between the agencies and transportation operators (e.g., Amtrak), that is information that could be redacted without withholding the documents in their entirety.  To the extent that "performance expectations" are articulated in a prospective manner, they arguably constitute "guidelines," and would be exempt if their disclosure would risk circumvention of the law.  However, given the nature of the Buffalo Sector Daily Reports, I would expect the vast majority of information contained therein to be retrospective, and therefore not to constitute "guidelines" under FOIA.[110]

Defendants are ordered to re-assess their assertions of Exemption 7(E) over the comments pages of each of the five hundred and forty-eight Buffalo Sector Daily Reports, using this Opinion as guidance, and to disclose all responsive non-exempt materials that can reasonably be segregated from exempt materials.  Additionally, defendants are required to release the names of the authors and recipients of the Reports, to the extent that they are agency heads or high-level subordinates.  Such information "does not generally fall within Exemption 6"[111]

---

[110]     *See* Opp. Mem. at 13.

[111]     *Aguirre*, 551 F. Supp. 2d at 53.  *Cf. Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 86 (D.D.C. 2003) ("The release of names and addresses in government files is not inherently and always a significant threat to privacy, but rather the privacy threat depends on the individual characteristics that the disclosure reveals and the consequences that are likely to ensue.") (quotation marks and citations omitted).

and defendants have provided no evidence to suggest any particular privacy threat posed by the revelation of these federal employees' names.  The public, on the other hand, has an interest in knowing whether the Reports reflect the views of the agency, rather than of particular agency employees.[112]

My ruling as to this set of documents is not based on waiver by defendants.  While the agency has chosen to release certain information in the past, that does not mean that it must release other *similar* information.  However, the fact that the requested information pertains to law enforcement activities along our nation's borders, which arguably falls under the broad topic of national security, is not a sufficient reason to uphold the claimed exemption.  The cases cited by defendants are inapposite insofar as they address the withholding of specific guidelines, techniques, and procedures, information of a different nature from what is sought here.[113]

---

[112]    I discuss the applicability of Exemption 6 and 7(C) to the names of document author and recipients below.  That reasoning applies equally to the authors and recipients of the comments pages of the Buffalo Sector Daily Reports.

[113]    *See* Def. Mem. at 15 (citing, *inter alia*, *Center for Nat'l Sec. Studies v. Immigration and Naturalization Serv.*, No. 87-2068, 1990 WL 236133, at *5-6 (D.C. Cir. Dec. 19, 1990) (upholding non-disclosure of INS plans in event of attack on U.S.); *Hammes v. United States Customs Serv.*, No. 94 Civ. 4868, 1994 WL 693717 (S.D.N.Y. Dec. 9, 2004) (upholding non-disclosure of Customs criteria for stopping passengers); *James v. United States Customs and Border Patrol*, 549 F. Supp. 2d 1, 10 (D.D.C. 2008) (upholding non-disclosure of "type of search" conducted on plaintiff in airport)).

B.      **Sample Form I-213s**[114]

Defendants have redacted "internal codes or databases" throughout

their production, citing Exemptions High 2 and 7(E), and explaining that "the

release of internal agency case codes used in agency databases could permit

individuals seeking to violate immigration and customs laws to circumvent the law

by fraudulently accessing secure databases and modifying or deleting sensitive

agency records."[115]  In their FOIA requests to CBP, plaintiffs sought I-213 arrest

forms, in part "to ascertain whether transportation raids in the interior of the U.S.

further border enforcement goals; whether transportation raids further terror-

related enforcement goals; and whether CBP officers carrying out transportation

raids arrest persons who are deemed lawfully present by United States Citizenship

_____

[114]     Plaintiffs claim that defendants asserted Exemption 2 without
concurrent assertion of Exemption 7(E) over this category of documents – the
charge codes contained in Sample Form I-213s (US000119-000735).  *See* Pl.
Letter at 3.  However, defendants contend that they did assert Exemption 7(E) over
these documents, by means of citation in their reply brief to a case in which
withholding of "the same charge codes" was upheld under Exemption 7(E),
*Unidad Latina en Acción v. United States Dep't of Homeland Sec.*, 253 F.R.D. 44
(D. Conn. 2008), and by means of the Lewandowski Declaration.  *See* Def. Letter
at 2.  While defendants' assertion of Exemption 7(E) should have been clearer in
their motion, the Court will consider the exemption to have been asserted,
particularly in light of *Milner*.

[115]     Def. Mem. at 10-11.

and Immigration Service ('USCIS')."[116]  Defendants have produced a sample set of

I-213 forms, but have redacted certain information, including field 45, which

contains "charge codes."  Charge codes are "used by the agency to indicate the

legal reason an individual was arrested for violation of immigration laws."[117]

Plaintiffs argue that disclosure of charge codes cited in the sample I-213s would

help to answer the above questions, which they assert are of significant public

import.[118]

       I find that the charge codes may not be withheld under Exemption

7(E) because, while the I-213 forms constitute "records or information compiled

for law enforcement purposes," the release of the charge codes contained therein

would not "disclose techniques or procedures for law enforcement investigations

or prosecutions, or . . . guidelines for law enforcement investigations or

prosecutions . . . ."[119]  Furthermore, as plaintiffs point out, defendants have already

released the catalogue of available charge codes.[120]  Given that defendants have

---

[116]    Opp. Mem. at 15.

[117]    *Id.*

[118]    *See id.*  Plaintiffs do not contest the other redactions made to the
Sample I-213s.  *See id.* at 16 n.8.

[119]    5 U.S.C. § 552(b)(7)(E).

[120]    *See* Opp. Mem. at 16 (citing US000736-743, "Appendix A: Initial and
Final Charge Codes," ("App'x A") released by CBP on December 16, 2010, Ex. G

already released that general information, it is difficult to imagine how the release of the codes cited on particular sample I-213 forms will compromise the security of agency databases or otherwise risk circumvention of the law.

Defendants assert that courts have previously upheld the exact redactions at issue here.  However, the cases that defendants cite are easily distinguishable in that they reference different sorts of codes,[121] or uphold the exemptions under Exemption High 2, which is no longer effective.[122]  Defendants are thus ordered to reproduce the sample I-213 forms without redacting the charge codes that appear in field 45.

_____

to Opp. Mem.; US000082, "ICE Academy Participant Workbook: I-213 Preparation," Ex. F to Opp. Mem.).

[121]   Defendants cite to one case in which the court held that "[a]ny *computer coding or website information* on [I-213s] is covered by both Exemptions (b)(2) High and (b)(7)(E), since the information is internal to DHS and would disclose information that might significantly risk circumvention of the law." *Unidad Latina*, 253 F.R.D. at 50 (emphasis added).  *See* Reply Mem. at 8. However, the charge codes sought by plaintiffs in the instant matter are not "computer coding or website information."  Rather, it is apparent from looking at the charge code catalogue that the codes correspond to the sections of the Immigration and Naturalization Act from which the authority to deem an individual inadmissible arises.  *See* App'x A (indicating, e.g., code I2A2 arises from INA § 212(a)(1)(A)(ii); code I2B arises from INA § 212(a)(2)(B), etc.).

[122]   *See* Def. Mem. at 8 (citing *Unidad Latina*, 253 F.R.D. at 50; *Buffalo Evening News, Inc. v. United States Border Patrol*, 791 F. Supp. 386 (W.D.N.Y. 1992) (upholding redaction of "code words used by the [Border Patrol] to identify deportability charges," under High 2, not under 7(E)).

C.     **Training Memorandum**

Defendants have withheld two documents that they have described as training memoranda.[123]  The documents were created by attorneys in CBP's Office of Assistant Chief Counsel and contain legal analysis and guidance to Border Patrol agents regarding the use of race or ethnicity in executing their duties, and analysis of case law concerning racial profiling in law enforcement.[124]  Defendants assert Exemption 5 in withholding these documents, claiming that they are properly protected under the attorney-client privilege and the attorney work product doctrine.

Plaintiffs make four arguments as to why the memoranda have been improperly withheld.  *First*, plaintiffs hypothesize that the memoranda describe "how CBP officers are trained to use, or avoid using, racial profiling while identifying persons for questioning and arrest."[125]  In view of the agency's public disavowal of racial profiling, plaintiffs argue that the memoranda are of great public interest insofar as their disclosure will help to confirm whether or not the

---

[123]     US000817-000826, US000827-000866.  *See* Def. Mem. at 19.

[124]     *See* Def. Mem. at 19.

[125]     Opp. Mem. at 19.

agency's practice is in accord with its public stance.[126]  Plaintiffs harken to the oft-repeated principle in FOIA law that "'an agency will not be permitted to develop a body of secret law used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege.'"[127]  Accordingly, plaintiffs ask the Court to order disclosure of these memoranda, "[g]iven the public's interest in establishing that, in fact, racial profiling is not used [] in the course of CBP's transportation checks."[128]

        *Second*, plaintiffs invoke the Supreme Court's holding that documents are not protected from disclosure under Exemption 5 if the "documents would be 'routinely' or 'normally' disclosed [through civil discovery] upon a showing of relevance."[129]  Plaintiffs argue that "CBP's past disclosure of racial profiling policies would make it reasonable to expect that they would be 'routinely' or 'normally' disclosed," citing CBP's release of two such memoranda in response to the initial FOIA request in this matter.[130]  *Third*, plaintiffs argue that the documents

---

[126]    *See id.* at 19-20.

[127]    *Id.* (quoting *Tax Analysts v. Internal Revenue Serv.*, 391 F. Supp. 2d 122, 130 (D.D.C. 2005) ("*Tax Analysts II*")).

[128]    *Id.* at 20.

[129]    *Id.* (quoting *United States Dep't of Justice v. Julian*, 486 U.S. 1, 12 (1988)).

[130]    *Id.*

were not created in connection with or in contemplation of any particular litigation, and therefore the attorney work product doctrine does not apply.[131]   *Finally*, plaintiffs argue that the documents were created as part of the agency's regular course of business, which also precludes their protection as attorney work product.[132]

Plaintiffs' first and second arguments pertain to both the attorney-client privilege and the attorney work product doctrine.   *First*, plaintiffs' guess that the memoranda may describe how CBP officers should use racial profiling does not come close to establishing the existence of a body of "secret law," particularly because plaintiffs also concede that the memoranda may describe how CBP officers should *avoid* using racial profiling, which would be in accordance with the agency's public position.[133]   Furthermore, the secret law doctrine in FOIA cases generally arises in contexts in which agencies are *rendering decisions* based on non-public analyses.[134]   I am aware of no precedent for evaluating whether law

---

[131]     *See id.* at 21.

[132]     *See id.* at 21, 22.

[133]     *See id.* at 19.

[134]     *See, e.g., Coastal States Gas Corp.*, 617 F.2d at 868 ("'to prevent the development of secret law within the Commission, we must require it to disclose orders and interpretations which it actually applies *in cases before it*'") (emphasis added) (quoting *Sterling Drug, Inc. v. Federal Trade Comm'n*, 450 F.2d 698, 708

enforcement *policies* constitute secret law.

        *Second*, contrary to plaintiffs' argument, I decline to find that because CBP has voluntarily disclosed certain memoranda on the same general topic in the past *in response to this very FOIA request,* that it "routinely" or "normally" discloses such information.  Nor do I find that CBP has waived its right to assert privilege over other such memoranda.[135]

        However, I do not reach plaintiffs' third and fourth arguments pertaining to the attorney work product doctrine, because I find that the documents have been properly withheld under the attorney-client privilege.  Defendants aver that the documents were "created by agency attorneys for the purpose of imparting legal advice to employees of the agency," and consist of legal analysis and guidance.[136]  Thus, the documents fall squarely within the attorney-client privilege and have been properly withheld under Exemption 5.

### D.    Authors and Recipients of the Memorandum and the Email

        Defendants have redacted the names, phone numbers and personal

---

(D.C. Cir. 1971)); *Tax Analysts II*, 391 F. Supp. 2d at 130 (citing *Sears, Roebuck*, 421 U.S. 132).

[135]    *See Coastal Delivery Corp.,* 272 F. Supp. 2d at 965-66.

[136]    *See* Def. Mem. at 19.  *See also Tax Analysts I*, 117 F.3d at 618 ("In the governmental context, the 'client' may be the agency and the attorney may be the agency lawyer.").

identifying information of both arrestees and agency personnel throughout the

document production, citing the privacy concerns embodied in Exemptions 6 and

7(C).[137]   While not contesting the vast majority of such redactions, plaintiffs seek

disclosure of the names of authors and recipients of two documents produced by

ICE at US000112 and US000114.[138]   The first document is a memorandum entitled

"Performance Appraisal Element #2," establishing required case levels for

"Element 2 –  Institutional Removal Program and Alien Criminal Apprehension

Program."[139]   The second document is an email with the subject line "FW:

Productivity," listing a number of requirements and expectations, including that

employees "produce a minimum of 3 actual Charging Documents Issued (CDI)

daily."[140]   Depicting the content of the two documents as "set[ting] out what

amounts to a quota system," plaintiffs argue that "the identity and functional role

of these individuals in the agency will indicate to what extent the documents reflect

agency-wide policy."[141]   They argue that the public interest at stake overrides the

privacy interests of the federal agency employees who wrote or received the

---

[137]     *See* Def. Mem. at 22.

[138]     *See* Opp. Mem. at 23.

[139]     US000112, Ex. H to Opp. Mem.  *See also* Table, at 2.

[140]     US000114, Ex. H to Opp. Mem.  *See also* Table, at 2-3.

[141]     Opp. Mem. at 23.

documents.[142]

## 1.     Exemption 7(C)

Before examining the balance of privacy and public interests, the threshold issue is whether the documents in question constitute the types of records that the exemptions are intended to protect.  Specifically, Exemption 7 and its subdivisions address "records or information compiled for law enforcement purposes."[143]   While ICE is unquestionably a federal law enforcement agency, not every document produced by ICE personnel has been "compiled for law enforcement purposes" under FOIA.  Courts have generally interpreted Exemption 7 as applying to records that pertain to specific investigations conducted by agencies, whether internal or external, and whether created or collected by the agency – in other words, investigatory files.[144]

---

[142]     *See id.* at 24.

[143]     5 U.S.C. § 552 (b)(7)(C).

[144]     *See, e.g.*, *Ortiz v. United States Dep't of Health and Human Servs.*, 70 F.3d 729, 732 (2d Cir. 1995) (finding letter that HHS's Office of Inspector General "used . . . to launch a criminal investigation" qualifies as a law enforcement record under Exemption 7); *Vento v. Internal Revenue Serv.*, 714 F. Supp. 2d 137, 148 (D.D.C. 2010) (finding documents "compiled in the course of an investigation into plaintiff's tax liability" qualify as law enforcement records under Exemption 7, and compiling cases); *Ligorner v. Reno*, 2 F. Supp. 2d 400 (S.D.N.Y. 1998) (finding complaint letter that contained the identity of an individual who accused another of misconduct within the Department of Justice qualifies as a law enforcement record under Exemption 7); *Lurie v. Department of Army*, 970 F. Supp. 19, 36 (D.D.C.

The two documents in question here, by contrast, are not investigatory files. Rather, they are directives regarding the general execution of tasks by agency personnel. While in a general sense, the tasks described in the two documents pertain to law enforcement, the documents are not investigatory, and thus, were not "compiled for law enforcement purposes." Accordingly, I find that the names of agency personnel who authored or received the two documents are not exempt under 7(C) because the documents do not constitute "records or information compiled for law enforcement purposes."[145]

### 2.    Exemption 6

I next consider the same threshold issue regarding whether the documents qualify under Exemption 6, as files "similar" to medical or personnel files. The Supreme Court has interpreted the term "similar files" broadly to include any "*detailed Government records on an individual* which can be identified as applying to that individual."[146] While the privacy right protected by FOIA "was not intended to turn upon the label of the file which contains the

---

1997) (finding records pertaining to Army's informal investigation of military medical researcher's representations qualify as law enforcement records under Exemption 7).

[145]    5 U.S.C. § 552 (b)(7)(C).

[146]    *Washington Post Co.*, 456 U.S. at 602 (emphasis added). *Accord Adamowicz v. Internal Revenue Serv.*, 672 F. Supp. 2d 454, 473 (S.D.N.Y. 2009).

damaging information,"[147] nor is it the case that every slip of paper on which a

name is written warrants protection.[148]  The inquiry is "whether the records at issue

are likely to contain the type of personal information that would be in a medical or

personnel file."[149]  Such information generally includes "'place of birth, date of

birth, date of marriage, employment history,'" and other "identifying information,"

though not necessarily "intimate" information.[150]  Examples of records that would

fall into the "similar files" category include administrative investigatory files,

which could contain personal information about the subject of the investigation and

about third-party witnesses;[151] "files [that] would contain . . . the information that

---

[147]   *Washington Post Co.*, 456 U.S. at 601.

[148]   *See id.* at 602 n.4 ("This construction of Exemption 6 will not render meaningless the threshold requirement that information be contained in personnel, medical, and similar files by reducing it to a test which fails to screen out any information that will not be screened out by the balancing of private against public interests.  As petitioners point out, there are undoubtedly many Government files which contain information not personal to any particular individual, the disclosure of which would nonetheless cause embarrassment to certain persons.  Information unrelated to any particular person presumably would not satisfy the threshold test.").

[149]   *Wood v. Federal Bureau of Investigation*, 432 F.3d at 86.

[150]   *Id.* (quoting *Washington Post Co.*, 456 U.S. at 600-01).

[151]   *See id.*  Obviously certain kinds of investigatory files might fall under both Exemptions 6 and 7(C).

normally is required from a passport applicant;"[152] or "[a]ttachments to an individual's asylum request consisting of personal history data and supporting affidavits."[153]

The two documents at issue here are nothing like a medical or personnel file.  They are not records "on an individual."[154]  Neither document contains any personal or identifying information apart from the names of the authors, recipients, and persons identified as "the SCOs."[155]  Therefore, the documents cannot be withheld under Exemption 6, because they do not constitute "similar files."

### 3.    Public Interest Outweighs Privacy Interests

Even if I were to find that the two documents in question constituted either "records or information compiled for law enforcement purposes" or "similar files," I would nonetheless conclude that the public interest in determining whether the policies set out in those documents are agency-wide or the work of a single agency employee outweighs the privacy interests of the federal employees in

---

[152]    *Washington Post Co.*, 456 U.S. at 600.

[153]    *Phillips v. Immigration and Customs Enforcement*, 385 F. Supp. 2d 296, 304 (S.D.N.Y. 2005).

[154]    *Washington Post Co.*, 456 U.S. at 602.

[155]    US000114.

withholding their names as the authors and recipients of the two documents.

The D.C. Circuit has held that "[FOIA] does not categorically exempt individuals' identities . . . because the privacy interest at stake may vary depending on the context in which it is asserted."[156]  While "[t]he privacy interests of U.S. government officials might be 'somewhat diminished' due to the countervailing interest of the public 'to be informed about what their government is up to,'"[157] federal employees nonetheless maintain "an identifiable privacy interest in avoiding disclosures of information that could lead to annoyance or harassment."[158] There is, however, persuasive authority for the proposition that information that "merely identifies the names of government officials who authored documents and received documents does not generally fall within Exemption 6."[159]

Therefore, under either the Exemption 6 standard of whether disclosure "would constitute a clearly unwarranted invasion of personal privacy" or the Exemption 7(C) standard of whether disclosure "could reasonably be

---

[156]   *Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 153 (D.C. Cir. 2006).

[157]   *Phillips*, 385 F. Supp. 2d at 305.

[158]   *Cawthon v. United States Dep't of Justice*, No. 05-0567, 2006 WL 581250, at *3 (D.D.C. Mar. 9, 2006).

[159]   *Aguirre*, 551 F. Supp. 2d at 53.

expected to constitute an unwarranted invasion of personal privacy,"[160] I find that the public interest in disclosure outweighs the privacy interest.  There is a substantial public interest in knowing whether the expectations and requirements articulated in the memoranda reflect high-level agency policy.  Significantly, plaintiffs seek only names, not phone numbers or other more intrusive categories of personal information.  Disclosure of these names, in conjunction with the already disclosed content of the memoranda, will help to inform the public as to "what their government is up to," as the Supreme Court has articulated as the underlying purpose of FOIA.[161]  Therefore, defendants must disclose the names of the authors and recipients of the two documents in question.

---

[160]    *Reporters Comm.*, 489 U.S. at 756 (considering the statutory language and legislative history of 6 and 7(C) to conclude that "the standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files").

[161]    *Id.* at 773.  The cases cited by defendants are all easily distinguished insofar as they uphold the withholding of phone numbers, email addresses, information pertaining to third parties, and/or names of *lower level* federal employees.  *See* Def. Mem. at 23 (citing *Budik v. Department of Army*, 742 F. Supp. 2d 20, 38 (D.D.C. 2010) (no public interest in disclosing government employee's e-mail address); *Amnesty Int'l v. Central Intelligence Agency*, No. 07 Civ. 5435, 2008 WL 2519908, at *15-16 (S.D.N.Y. June 19, 2008) (withholding third party phone number); *Phillips*, 385 F. Supp. 2d at 308 (withholding telephone number of government employee); *Judicial Watch, Inc. v. United States*, 84 Fed. App'x 335, 338-39 (4th Cir. 2004) (withholding names of lower level federal employees)).

## V.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part, and defendants are directed to make the additional disclosures ordered by this Opinion by July 1, 2011. The Clerk is directed to close this motion [Docket No. 25]. A conference is scheduled for July 22, 2011 at 5 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             June 16, 2011

44

**-Appearances-**

**For Plaintiff:**

Nancy Babette Morawetz, Esq.
Washington Square Legal Services, Inc.
245 Sullivan Street
New York, New York 10012

**For Defendants:**

David Bober
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York 10007