USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/27/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

FAMILIES FOR FREEDOM, JANE DOE  :
MARY DOE, and JOHN DOE,         :
                                :
             Plaintiffs,        :
                                :
        - against -             :        **OPINION AND ORDER**
                                :
UNITED STATES CUSTOMS AND BORDER :        10 Civ. 2705 (SAS)
PROTECTION, UNITED STATES       :
IMMIGRATION AND CUSTOMS         :
ENFORCEMENT, and UNITED STATES  :
 DEPARTMENT OF HOMELAND         :
SECURITY,                       :
                                :
             Defendants.        :
------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Families for Freedom, a non-profit advocacy organization, along with

Jane Doe, Mary Doe, and John Doe, three individuals in deportation proceedings,

bring suit against United States Customs and Border Protection ("CBP"), United

States Immigration and Customs Enforcement, and United States Department of

Homeland Security, seeking release of certain government records pursuant to the

Freedom of Information Act ("FOIA").[1]  The requested records pertain primarily to

the scope and practices of CBP operations on inter-city buses and trains, and

---

[1]      5 U.S.C. § 552 *et seq.*

1

plaintiffs have focused particular attention on the geographic area designated as the

"Buffalo Sector."[2]  Defendants now move for partial summary judgment on their

invocation of FOIA exemptions to withhold, in whole or in part, certain responsive

documents.[3]  Plaintiffs oppose defendants' motion and request that the Court order

production of three sets of documents that they allege were improperly redacted.[4]

For the reasons stated below, defendants' motion for summary judgment is granted

in part and denied in part, and defendants are ordered to remove redactions from a

number of the documents.

At the heart of FOIA is "a policy strongly favoring public disclosure

of information in the possession of federal agencies."[5]  "Disclosure, not secrecy, is

the dominant objective of the Act,"[6] and courts "construe FOIA exemptions

---

[2]      *See* First Amended Complaint ("FAC") ¶ 2.

[3]      *See* Defendants' Memorandum of Law in Support of Defendants' Second Motion for Partial Summary Judgment on Exemptions ("Def. Mem.") at 1.

[4]      *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Second Motion for Partial Summary Judgment on Exemptions ("Pl. Mem.") at 4.

[5]      *Halpern v. Federal Bureau of Investigation*, 181 F. 3d 279, 286 (2d Cir. 1999).

[6]      *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

narrowly, resolving all doubts in favor of disclosure."[7]  On his second day in office, President Barack Obama issued a memorandum instructing agencies "to usher in a new era of open Government" based on the principle that "democracy requires accountability, and accountability requires transparency."[8]  He instructed the executive branch to administer FOIA "with a clear presumption: In the face of doubt, openness prevails."[9]

## II.    BACKGROUND

The factual and procedural history of this case can be found in my Opinion and Order of June 16, 2011.[10]  Since that date, CBP has produced 705 pages of documents.[11]  The documents have been redacted pursuant to FOIA Exemptions 5, 6, 7(C), 7(E), and for non-responsiveness.[12]  Plaintiffs challenge CBP's redactions on the following documents: (1) notes from a meeting between

---

[7]    *Wood v. Federal Bureau of Investigation,* 432 F.3d 78, 83 (2d Cir. 2005).

[8]    Freedom of Information Act: Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 15 (Jan. 21, 2009).

[9]    *Id*.

[10]    *See Families for Freedom v. United States Customs & Border Protection*, — F. Supp. 2d —, No. 10 Civ. 2705, 2011 WL 2436707 (S.D.N.Y. June 16, 2011).

[11]    *See* Def. Mem. at 1.

[12]    *See id*. at 1-3.

CBP and Amtrak, US001644 to US001646; (2) intra-agency emails and attachments to those emails discussing CPB's staffing and arrest statistics and the agency's terminology relating to transportation "nodes" or hubs, US001647 to US001675 and US001634 to US001642; and (3) a legal memo written by the Department of Justice regarding the scope of CBP's liability for arrests made aboard Amtrak trains, US001676 to US001680.[13]  Plaintiffs also seek officer identification codes to facilitate their analysis of redacted information throughout the Buffalo Sector Daily Reports Commentary, US000867 to US001442, although they do not challenge those redactions as violations of FOIA.[14]

## III.   LEGAL STANDARD

### A.   FOIA and Summary Judgment

FOIA cases are generally and most appropriately resolved on motions for summary judgment.[15]  Summary judgment in the FOIA context, as in any other, is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[16]

---

[13]   *See* Pl. Mem. at 4.

[14]   *See id.* at 25.

[15]   *See Bloomberg L.P. v. Board of Governors of the Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009).

[16]   Fed. R. Civ. P. 56(c).

"An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"[17]  "In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."[18]

The agency bears the burden of showing that a withheld or redacted responsive document fits within one of FOIA's exemptions.[19] "The agency's decision that the information is exempt from disclosure receives no deference."[20] Accordingly, a court is required to conduct a *de novo* review of the record, deciding "'whether the agency has sustained its burden of demonstrating that the documents requested are not agency records or are exempt from disclosure under the FOIA.'"[21]

---

[17]     *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[18]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 242, 255).

[19]     5 U.S.C. § 552(a)(4)(B).

[20]     *Bloomberg, L.P. v. Board of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

[21]     *In Def. of Animals v. National Inst. of Health*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008) (quoting *Assassination Archives & Research Ctr. v. Central Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003)).

**B.     Exemption 5**

Exemption 5 protects "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party other than an agency in litigation with the agency."[22]  The exemption incorporates "all normal civil discovery privileges,"[23] including the attorney-client privilege and the attorney work-product doctrine.[24]  "The test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance."[25] "Whether its immunity from discovery is absolute or qualified, a [privileged] document cannot be said to be subject to 'routine' disclosure," and thus is protected under Exemption 5.[26]

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or

---

[22]     5 U.S.C. § 552(b)(5).

[23]     *Hopkins v. United States Dep't of Housing & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

[24]     *See National Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149-55 (1975); *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999).

[25]     *Federal Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 26 (1983) (quoting *Sears, Roebuck*, 421 U.S. at 148-49).

[26]     *Id.* at 27.

services."[27]    Advice from an attorney to his or her client is also protected by the

privilege.[28]    "In the governmental context, the client may be the agency and the

attorney may be an agency lawyer."[29]    The attorney-client privilege under

Exemption 5 "is narrowly construed and is limited to those situations in which its

purpose will be served."[30]

       The attorney work product doctrine applies "to memoranda prepared

by an attorney in contemplation of litigation which sets forth the attorney's theory

of the case and [her] litigation strategy."[31]    "The attorney work product privilege

protects 'the files and the mental impressions of an attorney . . . reflected, of

course, in interviews, statements, memoranda, correspondence, briefs, mental

impressions, personal beliefs, and countless other tangible and intangible ways'

prepared in anticipation of litigation."[32]

---

[27]    *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997).

[28]    *See In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992).

[29]    *Tax Analysts*, 117 F.3d at 618.

[30]    *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).

[31]    *Sears, Roebuck*, 421 U.S. at 154.

[32]    *A. Michael's Piano, Inc. v. Federal Trade Comm'n*, 18 F.3d 138, 146 (2d Cir. 1994) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11(1947)).

C.    **Exemptions 6 and 7(C)**

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[33]   The purpose of Exemption 6 is to "'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'"[34] If disclosure would compromise "substantial privacy interests," the information need not be released.[35]  If no substantial privacy interest is established, however, the court must weigh the "potential harm to privacy interests" against "the public interest in disclosure of the requested information."[36] The "only relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government."[37]  "The requesting party bears the burden of establishing that

---

[33]     5 U.S.C. § 552(b)(6).

[34]     *Wood*, 432 F.3d at 86 (quoting *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982)).

[35]     *Aguirre v. Securities & Exch. Comm'n*, 551 F. Supp. 2d 33, 53 (D.D.C. 2008).

[36]     *Id*.

[37]     *United States Dep't of Def. v. Federal Labor Relations Auth.*, 510 U.S. 487, 495 (1994).

disclosure of personal information would serve a public interest cognizable under FOIA."[38]  However, information that "merely identifies the names of government officials who authored documents and received documents" does not generally fall within Exemption 6.[39]

Exemption 7 covers only "records or information compiled for law enforcement purposes."  The Second Circuit has not elucidated precisely what constitutes "law enforcement purposes."  In 1986, Congress amended the text of Exemption 7, replacing the phrase "investigatory records compiled for law enforcement purposes" to the current "records or information compiled for law enforcement purposes."[40]  In *Tax Analysts v. Internal Revenue Service*, the D.C. Circuit rejected the petitioner's argument that only records related to specific investigations are covered by the phrase.[41]  As a result of the 1986 amendments, the D.C. Circuit explained, "an agency may seek to block the disclosure of internal

---

[38]     *Associated Press v. United States Dep't of Justice*, 549 F.3d 62, 66 (2d Cir. 2008) (citing *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).

[39]     *Aguirre*, 551 F. Supp. 2d at 53.  *Accord VoteHemp v. Drug Enforcement Admin.*, 567 F. Supp. 2d 1, 15-16 (D.D.C. 2004).

[40]     Anti-Drug Abuse Act of 1986, § 1802(a), Pub. L. No. 99-570, 100 Stat. 3207, 3207-48 (1986) (amending 5 U.S.C. § 552(b)(7)).

[41]     *See Tax Analysts v. Internal Revenue Serv.*,  294 F.3d 71 (D.C. Cir. 2002).

agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation."[42]

Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of privacy."[43]  The inquiry under Exemption 7(C) is similar to that under Exemption 6: *First*, is the information compiled for law enforcement purposes? *Second*, how does the privacy interest at stake weigh against the public's right to information about its government?  The privacy interest at stake is measured in the same way under both Exemption 6 and Exemption 7(C), but because of the differences in the statute's text, a greater invasion of that privacy interest will be tolerated under Exemption 6 than under Exemption 7(C).[44]  The public interest at stake in this test is that of "'open[ing] agency action to the light of public scrutiny.'"[45]

---

[42]     *Id.* at 79.

[43]     5 U.S.C. §§ 552 (b)(7)(C).

[44]     *See Associated Press v. United States Dep't of Def.*, 554 F.3d 274, 285 n.9 (2d Cir. 2009).

[45]     *Id.* at 285 (quoting *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 772 (1989)).

When presented with a request for the disclosure of a government employee's name or personal information and a government assertion of privacy interests under either Exemption 6 or Exemption 7(C), courts in the Second Circuit include the following factors in their balancing analysis:

> (1) the government employee's rank; (2) the degree of wrongdoing and strength of evidence against the employee; (3) whether there are other ways to obtain the information; (4) whether the information sought sheds light on a government activity; and (5) whether the information sought is related to job function or is of a personal nature. The factors are not all inclusive, and no one factor is dispositive.[46]

**D.    Exemption 7(E)**

Exemption 7(E) covers records or information compiled for law enforcement purposes, but only to the extent that the production of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."[47]

**IV.    DISCUSSION**

Plaintiffs have only challenged the redactions on three sets of

---

[46]    *Perlman v. United States Dep't of Justice*, 312 F.3d 100, 107 (2d Cir. 2002).

[47]    5 U.S.C. §§ 552 (b)(7)(E).

11

documents produced by defendants.  In addition, plaintiffs request that defendants
provide coding for certain redacted information.  I address each issue in turn.

### A.    Portions of the Amtrak Meeting Notes May Remain Redacted

The redacted version of this document reveals that CBP officials met
with Amtrak officials on March 5, 2008 to discuss transportation checks conducted
by the Buffalo Sector Border Patrol aboard Amtrak trains.[48]  The notes were
compiled and prepared by a CBP official who attended the meeting.  The parties
discussed the process for apprehensions on specific trains, Amtrak raised various
concerns about Border Patrol's techniques and made a proposal for changing those
techniques, and the Border Patrol explained its priorities and perspectives.[49]

Plaintiffs argue that the Amtrak meeting notes are not exempt under
7(E) because (1) they were not created for law enforcement purpose and (2) they
are not law enforcement techniques and procedures or guidelines whose disclosure
could reasonably be expected to risk circumvention of the law.  Plaintiffs are
correct with respect to some of the redacted information, which must be released.
With respect to the remainder of the material, a credible argument can be made that

---

[48]    *See* 3/5/08 Meeting with Amtrak Personnel Notes ("Amtrak meeting notes") at 1-3. *See also Families for Freedom*, 2011 WL 4599592, at *6-8, discussing this document in detail.

[49]    *See id*.

the information – albeit indirectly – implicates law enforcement techniques and is thus exempt.

Plaintiffs correctly note that not every document produced by law enforcement agencies was created for law enforcement purposes under FOIA. However, the Amtrak meeting notes were created for that purpose – they constitute the memorialization of a meeting in which Border Patrol officials met with Amtrak in order to discuss how their law enforcement activities impacted the company's transit operations and how they might adjust those activities.

Plaintiffs argue that because, according to Border Patrol, the vast majority of transit arrests began with what the arresting officer describes as a "consensual" interaction with the arrestee,[50] the Amtrak meeting notes "had nothing to do with law enforcement, because CBP's presence on Amtrak trains was not for the purpose of conducting law enforcement investigation pursuant to a reasonable suspicion of illegal activity. Rather, CBP boarded Amtrak trains merely to conduct 'consensual conversations' with willing passengers."[51] But law enforcement investigations frequently begin before there is reasonable suspicion sufficient to justify a non-consensual stop and plaintiffs have pointed to no

---

[50]    *See* Pl. Mem. at 8 n.2.

[51]    *Id*. at 11.

authority to suggest that a communication regarding law enforcement activity in the absence of reasonable suspicion is not covered by Exemption 7(E). Plaintiffs also argue that because the defendants' use of upstate transportation checks is generally known to the public, the notes cannot be withheld.[52] However, as defendants correctly note, the redactions protect details concerning specific techniques used in these transportation checks, not generalities regarding the existence of the checks.[53]

Plaintiffs further argue that even if the Amtrak meeting notes were compiled for law enforcement purposes, they do not contain techniques and procedures. The Second Circuit has cited Webster's dictionary for the simple proposition that a technique is "'a technical method of accomplishing a desired aim'" and a procedure is "'a particular way of doing or of going about the accomplishment of something.'"[54] My in camera review reveals that the notes address how often the Border Patrol checks various specific trains, what time of day and at what stations it makes those checks, how its agents board and navigate

---

[52]   *See id.* at 13 (citing *Hall v. United States Dep't of Justice*, No. 87 Civ. 0474, 1989 WL 24542, at *6 (D.D.C. Mar. 8, 1989)).

[53]   *See* Def. Mem. at 4.

[54]   *Allard K. Lowenstein Int'l Human Rights Project v. Department of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) (quoting Webster's Third New International Dictionary (1986)).

14

the trains, and other issues relating to the agency's law enforcement techniques. Because production of this information "would disclose techniques and procedures for law enforcement investigations," not simply "guidelines for law enforcement investigations," it is irrelevant whether such disclosure "could reasonably be expected to risk circumvention of the law."[55]

The following redacted portions of the document do not describe law enforcement techniques or law enforcement guidelines[56] the disclosure of which would risk circumvention of the law, and therefore must be released: (1) the job titles of the attendees at the meeting; (2) the penultimate paragraph on the first page, which provides a historical arrest statistic; (3) the two first bulleted paragraphs on the second page, beginning with the words "Erie" and "When," which relate to Amtrak's operations, not to Border Patrol's; (4) the entire sentence beginning with the word "Amtrak" in the third bulleted paragraph, which relates to Amtrak's preferences; (5) the entire fourth bulleted paragraph, with the exception of the first sentence, which addresses the impact of Border Patrol's actions on lawful aliens; (6) the entire second paragraph on the third page; (7) the sentence beginning "Amtrak offered" on the third page; (8) the sentence beginning

---

[55]     5 U.S.C. § 552 (b)(7)(E).  *See Lowenstein*, 626 F.3d at 680-82.

[56]     The Second Circuit defines "guideline" as "an indication or outline of future policy or conduct."  *Lowenstein*, 626 F.3d at 682.

"This would eliminate" on the third page; and (9) the first sentence of the document's final paragraph.  Although some of these phrases arguably lay out law enforcement guidelines, their disclosure would not risk circumvention of the law.

**B.    Emails and Attachments Containing Staffing Statistics, Arrest Statistics, Agency Definitions, and Names and Personal Information Must Be Partially Disclosed**

The next group of redactions challenged by plaintiffs relates to a set of emails from July 2, 5, and 6 of 2010[57] and attachments to those emails.[58]  From these documents, defendants have redacted the following information: (1) arrest statistics for every Border Patrol sector in the country other than the Buffalo Sector (on the grounds that the withheld information is not responsive to plaintiffs' FOIA request)[59]; (2) staffing statistics for every Border Patrol sector in the country, including the Buffalo Sector (on responsiveness grounds and because disclosure would reveal law enforcement techniques, procedures, and guidelines)[60]; (3) official definitions of transit nodes (on the grounds that they contain law enforcement guidelines)[61]; and (4) the names, titles, email addresses, and phone

---

[57]     *See* US001647– US001675.

[58]     *See* US001634 – US001642.

[59]     *See* Def. Mem. at 16.

[60]     *See id*. at 14, 16.

[61]     *See id*. at 14-15.

16

numbers of Border Patrol employees (on the grounds that releasing the information

would be an unwarranted invasion of personal privacy).[62]  Some of these

redactions comply with FOIA and others do not.

### 1.    2008 and 2009 Arrest Statistics Must Be Released But 2010 Statistics May Remain Redacted

Documents US001634 – US001637 and US001640 –  US001643

contain CBP arrest statistics for each of the twenty Border Patrol sectors

nationwide from 2008 through 2010, broken down by type of inspection (traffic,

bus, train, etc.) and by whether the person arrested was Mexican, "Other Than

Mexican," or an "Alien from a Special Interest Country."

Defendants have redacted the 2008 and 2009 arrest statistics for all

sectors other than the Buffalo Sector and have redacted all statistics from 2010.

They defend their actions by arguing that the redaction "comports with the spirit"

of my June 16, 2011 Opinion and Order[63] and because plaintiffs did not request

information beyond the Buffalo sector, any other information is non-responsive.[64]

---

[62]     *See id*. at 6-10.

[63]     *Id*. at 16.

[64]     *See id.* at 16-17, citing *Dettman v. United States Dep't of Justice*, 802
F.2d 1472, 1475 (D.C. Cir. 1986) for the proposition that the government may
redact the non-responsive portions of documents that contain responsive
information.

In my previous order, I permitted defendants to redact comparative station-level data within the Buffalo Sector, in response to the Border Patrol's theory that release of arrest statistics by station could "theoretically aid circumvention of the law by publicizing the relative activity or success of Border Patrol agents in effecting apprehensions at each station."[65]  Because I held that defendants were permitted to "redact the information so that only the Rochester Station arrest data and Buffalo Sector arrest totals are disclosed," defendants now seek to withhold all statistics other than Buffalo Sector statistics.  Defendants assert that this approach comports with my previous order, but they are mistaken. My previous order related to the redaction of station-level data within the Buffalo sector, not sector-level data from around the country.

Although it is true that much of plaintiffs' request focused on the Buffalo Sector and its Rochester Station, other portions of the plaintiffs' request were more expansive.  Request number 17 sought "[a]ny reports that contain information about persons arrested on inter-city trains and buses for the years 2003, 2004, 2005, 2006, 2007, 2008, and 2009."[66]  This broad request differs from the Buffalo-specific requests such as number 5, which sought "[t]he total number

---

[65]     *Families for Freedom*, 2011 WL 2436707, at *7.

[66]     April 2, 2010 FOIA Request ("2010 FOIA Request"), Ex. O to FAC.

18

of persons arrested by BP officers operating in the Buffalo BP Sector for 2009."[67]

The arrest statistics are responsive to plaintiffs' request number 17: they are

reports that contain information about persons arrested on trains and busses. The

2008 and 2009 data must be disclosed. However, because plaintiffs did not request

information from 2010, that data may be redacted as non-responsive.

### 2.   Buffalo Sector Staffing Statistics Must Be Released But Statistics from Other Sectors May Remain Redacted

Documents US001638 and US001639 provide transit check staffing

statistics from sectors across the country for 2009 and the first six months of 2010.

The data is sorted by the category of the officer's duty (traffic, bus, train, etc.).

Defendants have redacted all of the data, including data from the Buffalo sector, on

the same responsiveness grounds on which they redacted the arrest statistics and

also on the basis of Exemption 7(E), arguing that disclosure of "the manpower

devoted to the transportation checks . . . would create the risk that individuals who

have crossed the border illegally would attempt to evade Border Patrol efforts to

apprehend them."[68]

This production is in response to plaintiffs' FOIA request number 6,

which sought "Border Patrol officer staffing levels for the Rochester BP Station

---

[67]   *Id.*

[68]   Def. Mem. at 16.

and the Buffalo BP Sector for the years 2003, 2004, 2005, 2006, 2007, 2008, and 2009."[69]  This request is limited to the Buffalo sector, unlike request number 17. Defendants may redact all statistics on these pages from 2010 and from sectors other than Buffalo.

Information compiled for law enforcement purposes may be withheld if it "would disclose techniques and procedures for law enforcement investigations" or if it would "disclose guidelines for law enforcement investigations. . . if such disclosure could reasonably be expected to risk circumvention of the law."[70]  According to defendants,

> disclosure of the number of agents devoted to particular types of duties would reveal details about law enforcement techniques and procedures; namely, traffic checks. Disclosure of manpower devoted to particular investigatory techniques could aid circumvention of the law, in that persons seeking to evade the law could focus their efforts on areas with less manpower.[71]

Defendants argue that staffing statistics from 2009 and 2010 somehow include "techniques and procedures."  Defendants have pointed to no instances in

---

[69]    2010 FOIA Request.

[70]    5 U.S.C. § 552 (b)(7)(E). *See Lowenstein*, 626 F.3d 678, for the Second Circuit's interpretation of these sentences.

[71]    Declaration of Robert Lewandowski, Chief of Staff of United States Border Patrol ("Lewandowski Decl."), in support of Defendants' Second Motion for Partial Summary Judgment on Exemptions ¶ 14.

which a court has held that law enforcement statistics are covered by Exemption 7(E).  The terms "techniques" and "procedures" refer to specific methods of law enforcement, not policy and budgetary choices about the assignment of personnel.  Techniques and procedures include how, where, and when agents board Buffalo-region trains and buses, talk to passengers, and make arrests – information that defendants have properly redacted from other documents.  The words do not refer to the staffing decisions defendants made years ago.

Although current or prospective staffing statistics could arguably fall under the definition of "guidelines," plaintiffs seek historical statistics.  Defendants do not assert that the current distribution of agents is similar to the distribution of agents in 2009.  Plaintiffs, on the other hand, have pointed to evidence showing that Border Patrol's practices have changed dramatically in recent months:  According to the Associated Press, "[t]he U.S. Border Patrol has quietly stopped its controversial practice of routinely searching buses, trains and airports for illegal immigrants at transportation hubs along the northern border and in the U.S. interior."[72]  The union representing Border Patrol agents has stated that all sectors except for those on the southwest border have been instructed to conduct checks

---

[72]    Gene Johnson, *US Scales Back Northern Border Checks*, MSNBC.com (Oct. 29, 2011, 12:22 AM), http://www.msnbc.msn.com/id/45084559/ns/us_news-security/t/us-scales-back-northern-border-checks/.

based only on specific intelligence and to end routine transportation checks.[73]  The

Border Patrol does not deny that such a change has taken place.

Release of historical staffing statistics could not reasonably be

expected to risk circumvention of the law.  Of course, *any* information about past

law enforcement practices could theoretically give would-be criminals help that

they would not otherwise have.  Congress has made clear that before guidelines

may be withheld, however, there must be a *reasonable* increased risk of

circumvention of the law.  Such risks are lowest in the context of historical

information and defendants have provided no evidence that this release would pose

such a risk.  Courts have repeatedly held that "disclosure, not secrecy, is the

dominant objective of the Act,"[74] and that "we construe FOIA exemptions

narrowly, resolving all doubts in favor of disclosure."[75]  Those principles are not

empty recitations; they must guide my application of the law.  Defendants must

release the Buffalo Sector staffing statistics for 2009.

### 3.    Official Definitions of Transit Nodes Must Be Released

Relying on Exemption 7(E), defendants have redacted

---

[73]    *See id.*

[74]    *Klamath Water Users Protective Ass'n.*, 532 U.S. at 1.

[75]    *Wood*, 432 F.3d at 83.

22

the Border Patrol's working definitions of certain types of transit
nodes, because the definitions contain law enforcement guidelines
and procedures regarding how often certain types of transportation
nodes are monitored, such as, for example, whether they are
monitored routinely or only in response to specific intelligence.[76]

The public documents reveal that CBP has official definitions of two

types of transit nodes – Primary and Secondary.[77]  These definitions relate to

whether the nodes are monitored routinely or only in response to specific

intelligence.[78]  The disclosure of the definitions could not reasonably be expected

to risk circumvention of the law.  In addition, the redacted definitions include little

substantive information beyond that already disclosed in the declaration submitted

by Chief of Staff Lewandowski.  Therefore, the two paragraphs on US001634 must

be disclosed.

> **4.    Some Names and Titles of CBP Employees in the Inter-
> Agency Emails Must Be Released and Others May Remain
> Redacted**

Defendants have redacted the names, titles, email addresses, and

phone numbers of CBP employees under Exemption 6, which exempts from

disclosure "personnel and medical files and similar files the disclosure of which

---

[76]    Lewandowski Decl. ¶ 13.

[77]    *See* 7/2/10 Email (2:52 PM), US001648.

[78]    *See* Lewandowski Decl. ¶ 13.

would constitute a clearly unwarranted invasion of personal privacy" and under
Exemption 7, which exempts "records or information compiled for law
enforcement purposes, but only to the extent that the production . . . (C) could
reasonably be expected to constitute an unwarranted invasion of personal
privacy."[79]   Plaintiffs challenge the redactions of names from the emails.

### a.    Exemption 6 Is Inapplicable to These Emails

Defendants argue that the Supreme Court has interpreted Exemption 6
broadly, so that "all information that 'applies to a particular individual' meets the
threshold requirement for protection under this exemption."[80]   Plaintiffs argue that
based on FOIA's text, the exemption only applies to information contained in
personnel, medical, or similar files.[81]

In *Wood v. Federal Bureau of Investigation*, the Second Circuit laid
out the process for applying Exemption 6:

> Whether the names and other identifying information about
> government investigators may be withheld under Exemption 6 is a
> two-part inquiry.  First, we must determine whether the personal

---

[79]    5 U.S.C. §§ 552 (b)(6), 552 (b)(7)(C).  Defendants have also redacted
names and personal identifying information of individuals who were stopped or
arrested by Border Patrol agents.  *See* Landowski Decl. ¶ 7.  Plaintiffs do not
challenge these redactions.

[80]    Def. Mem. at 6, citing *Washington Post Co.*, 456 U.S. at 602.

[81]    *See* Pl. Mem. at 19-20.

information is contained in a file similar to a medical or personnel file. In considering whether the information is contained in a 'similar' file, we ask whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file. . . . At the second step of the analysis under Exemption 6, we balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the names would constitute a clearly unwarranted invasion of personal privacy.[82]

Both the plain meaning of the statute and the Second Circuit's method of applying it make clear that Exemption 6 applies only to personnel and medical files and to similar files, such as those containing investigations of alleged corruption, passport applications, asylum requests, or detainee abuse.[83]  The emails at issue here are nothing like personnel or medical files.  They are mundane interoffice communications that do not contain any detailed personal information. Some of the emails include standard signature lines with the sender's name, position, department, and phone number. Some of the emails include the email addresses of senders or recipients of the messages; some  do not.  Because these

---

[82]     *Wood*, 432 F.3d at 86 (quotation omitted).  The court explained that the inquiry is "whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file" such as "place of birth, date of birth, date of marriage, employment history," and other "identifying information," though not necessarily "intimate" information. *Id.*

[83]     *See Perlman*, 312 F.3d 100 (corruption); *Washington Post*, 456 U.S. 595 (passport applications); *Phillips v. Immigration and Customs Enforcement*, 385 F. Supp. 2d 296 (S.D.N.Y. 2005) (asylum requests);  *Associated Press*, 554 F.3d 274 (detainee abuse).

emails can in no way be construed as similar to personnel or medical files, my

inquiry stops at step one.  There is no need to go to the second step and balance the

public's interest in disclosure against the privacy interests of the government

employees.

### b. Exemption 7(C) Is Applicable and Permits Some of the Redactions that Defendants Have Made

However, defendants also rely on Exemption 7(C) for their redactions

of the names, titles, phone numbers, and email addresses in these emails.[84]  This

exemption is more appropriate.  The emails have been compiled for law

enforcement purposes.  Plaintiffs argue that the emails relate to "Border Patrol's

policy functions, including sharing of statistics and official agency definitions

within DHS."[85]  While the plaintiffs correctly note that not all documents produced

by a law enforcement agency are compiled for law enforcement purposes, these

particular emails, which compile arrest statistics and staffing levels, do meet that

threshold.  Additionally, the disclosure of the names, phone numbers, and email

addresses of government employees implicates more than a *de minimis* privacy

---

[84]   *See* Lewandowski Decl. ¶ 9.

[85]   Def. Mem. at 21.

interest of those employees.[86]

The second step of the inquiry requires balancing "the citizens' right to be informed about 'what their government is up to'"[87] against the privacy interest of the employees whose information is redacted, according to the factors articulated in *Perlman*:

(1) Government employee's rank:  Some of the redacted names appear to be those of low level employees; others belong to high-level officials, like Chief of Staff Lewandowski.

(2) Degree of wrongdoing: This factor is inapplicable here.

(3) Other ways to obtain the information: The information cannot be obtained through any other means.

(4) Shedding light on government activity: The authors' titles and the names of the offices in which they work shed light on government activity because they clarify what functions are performed by what government agencies; the names of the officials have limited relevance; the email addresses and phone numbers

---

[86]   *See Federal Labor Relations Auth. v. United States Dep't of Veterans Affairs*, 958 F.2d 503, 510 (2d Cir. 1992) ("an individual has a general privacy interest in preventing dissemination of his or her name and home address"); *Associated Press*, 554 F.3d at 285 ("FOIA requires only a measurable interest in privacy to trigger the application of the disclosure balancing tests.").

[87]   *Reporters Comm.*, 489 U.S. at 773.

provide the public with no substantive information.

(5) Professional versus personal information: The redacted information is largely professional, although names are personal as well.

Based on these factors, defendants must disclose: (a) all titles and names of offices that appear in the emails and the (b) names of high level officials such as the chief of staff, deputy chief of staff, and division chief. The government may redact all email addresses and phone numbers.

## C.   The Department of Justice Memorandum May Remain Redacted

Defendants have produced, in almost completely redacted form, "one four-page memorandum authored by an Assistant United States Attorney in the Western District of New York to the chief of that office's civil division, offering a legal opinion on legal standards applicable to immigration checks conducted by the Border Patrol aboard Amtrak trains."[88]  Defendants' redaction is pursuant to FOIA Exemption 5, which shields "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."[89]  Defendants claim that the memorandum is protected by the attorney-client privilege because it is legal advice prepared at the request of the

---

[88]     Def. Mem. at 3.

[89]     5 U.S.C. §§ 552 (b)(5).

Border Patrol and by the attorney work-product privilege because it was "prepared in part due to Border Patrol's concern that Border Patrol agents may be subject to litigation brought by people arrested during immigration checks."[90]

Plaintiffs' objections to the redactions are unavailing. Their first argument is that the document is not deliberative or pre-decisional.[91] This confuses the deliberative process privilege with the attorney-client privilege. Their second argument is that defendants have failed "to establish whether litigation is ongoing, whether the litigation ever occurred, or whether Defendants' 'anticipation' of potential litigation was reasonable."[92] Given Border Patrol's extensive program of transportation checks and arrests, its anticipation of litigation was reasonable. The memorandum is a classic attorney-client communication and may well be protected attorney work-product. It is exempt from disclosure.

### D.   Buffalo Sector Daily Reports Commentary May Remain Redacted

Defendants have produced 652 pages of "comments" from the Buffalo Sector daily reports from 2008 and 2009, which are essentially summaries of the Border Patrol's law enforcement activities on a day-by-day basis. Defendants have

---

[90]     Def. Mem. at 5-6.

[91]     *See* Pl. Mem. at 24.

[92]     *Id.*

redacted these documents pursuant to Exemption 7(E) for law enforcement

purposes; pursuant to Exemptions 6 and 7(C) for privacy reasons; pursuant to

Exemption 5 for occasional attorney-client communications and attorney work-

product; and for non-responsiveness.  Plaintiffs do not challenge the redactions by

defendants, including the redactions of arresting officers' identities.[93]  Instead, they

"request that defendants produce the documents with the arresting officers coded

rather than completely redacted, as defendants have previously done, pursuant to

prior agreement with plaintiffs, in order to protect the individual identity of the

arresting officer.  This will allow plaintiffs to analyze the information without any

risk of circumvention of the law."[94]  Plaintiffs also request dates on the

commentary.  Plaintiffs do not assert that they have a legal right to the officer

coding, and defendants argue that because "FOIA does not impose any obligation

on the Government to create data or documents not contained in the documents

produced," they should not be obliged to provide the coding.[95]

   Plaintiffs have not explained why they need the officer coding or

provided the Court with any examples of daily reports commentary in which the

---

[93]  Pl. Mem. at 25.

[94]  *Id*.

[95]  Defendants' Reply Memorandum of Law In Support of Government's
Second Motion for Partial Summary Judgment on Exemptions at 2.

redaction of officers' names hinders comprehension of the information.  Plaintiffs'

request for coding is denied but plaintiffs may renew their request if they can

identify specific instances where the redactions hinder the public's comprehension

of the government's activity.  In that event, the Court will then balance the privacy

interests of the government employees against the public's interest, and coding

might offer an appropriate resolution.

My limited in camera review of the commentary does not reveal that

defendants have improperly redacted dates from the commentary.  At various

points in the commentary, dates have been produced in unredacted form.[96]  Other

pages have no dates.  Defendants do not have the obligation to create new

information in response to FOIA requests.  However, it seems unlikely that so

many of these *daily* reports were created without identifying dates.  For example,

the  reports' metadata may have contained the date on which they were created; or

perhaps they were archived according by date.  Defendants may not withhold this

information if it exists.

Finally, defendants are granted summary judgment on all exemptions

not challenged by plaintiffs (with the exception of arresting officers' identities).

## V.    CONCLUSION

---

[96]      *See*, *e.g.*, the dates 01/10/09 and 01/11/09 on US001200, the date
04/02/09 on US001300, and the dates 6/21/09 and 6/22/09 on US 001400.

31

For the reasons explained above, defendants' motion for summary judgment is granted in part and denied in part.  The Clerk of the Court is instructed to close this motion [Docket No. 58].  Defendants are ordered to produce the documents in compliance with this Opinion and Order by January 9, 2012.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 27, 2011

32

**-Appearances-**

**For Plaintiffs:**

Nancy Morawetz, Esq.
Washington Square Legal Services, Inc.
245 Sullivan Street
New York, New York 10012
(212) 998-6430

**For Defendants:**

David Bober
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York 10007
(212) 637-2718